(C.D. 2577)

HURRICANE IMPORT CO.
WHEELER & MILLER } *v.* UNITED STATES

United States Customs Court, First Division

(Decided September 28, 1965)

*Glad & Tuttle* (*George R. Tuttle* of counsel) for the plaintiffs.
*John W. Douglas*, Assistant Attorney General (*Mollie Strum*, trial attorney), for the defendant.

Before OLIVER, WILSON, AND NICHOLS, Judges

NICHOLS, Judge: The merchandise involved in this case consists of gunracks, imported from Japan and entered at the port of San Francisco on June 4, 1962. Two of the invoice items are described as gun wall racks and the third as gun corner racks. All were assessed with duty at 16⅔ per centum ad valorem under paragraph 412 of the Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade, T.D. 52373, supplemented by T.D. 52476, as manufactures in chief value of wood. It is claimed that wall gunracks and other merchandise covered by the entry are properly dutiable at 10½ per centum ad valorem under said paragraph 412, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, as furniture, other than chairs.

The pertinent provisions of the tariff act, as modified, are as follows:

[Par. 412, as modified by T.D.'s 52373 and 52476]. Manufactures of wood or bark, or of which wood or bark is the component material of chief value, not specially provided for:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

Other (except * * *)_____ 16⅔% ad val.

[Par. 412, as modified by T.D. 54108]. Furniture, wholly or partly finished, and parts thereof, wholly or in chief value of wood, and not specially provided for:

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

| | A | B | C |
|---|---|---|---|
| Other furniture_____ | * * * | * * * | 10½% ad val. |

At the trial, Fred Schlesinger, vice president and general manager of the home furnishings division of Hurricane Import Co., testified that he was familiar with the imported articles; that he had "created them from the Japanese sources of chair manufacturers, originally"; and that he had supervised their importation. Item 1104–W on the invoice is a corner model, specifically designed to utilize corner areas in family rooms or den rooms. The "W" indicates it is in walnut finish. A sample of this item was received in evidence as plaintiffs' exhibit 1. It is in knocked-down condition and consists of six pieces of wood. There are two side pieces, about 3½ feet high, two pieces that fit into grooves in the side piece, one near the top and one near the bottom, a curved locking bar, and a stretcher bar. The piece that fits at the bottom is 10½ inches deep, has a curved front portion measuring about 24 inches, and a straight back portion about 9 inches wide. There are places on it in which four gun butts could rest. The piece that fits near the top is 6 inches deep, has a curved front portion measuring about 16 inches, and a straight back portion about 8½ inches wide. There are holes for the insertion of four gun muzzles. According to the witness, the stretcher bar tightens up the entire fram-

ing and the curved lock bar keeps the guns in place and serves as a safety precaution. It was designed for use standing on the floor. It would not be used on the wall because average ceiling heights are 8 feet, and, according to the witness, this would almost reach the ceiling if raised any higher.

Mr. Schlesinger testified that the article, received in evidence as plaintiffs' exhibit 2, represented the item designated on the invoice as 1204–W except that it was in natural finish and should have been designated "N." This article is a rectangular piece about 34 inches high, 23 inches wide, and 6 inches deep. The lower bottom portion contains a drawer which may be locked. Two pieces of wood extend vertically from the top of the drawer portion. A crosspiece connects these near the top. There are four holes in each side piece and the left-hand one is hinged and fashioned to open so that the guns may be inserted, after which it is closed and locked. Four hangers are on the back of the article. According to the witness, this article is affixed to the wall with heavy type wall hooks.

Plaintiffs' exhibit 3 represented item 204–W and is similar to plaintiffs' exhibit 2 except that it is slightly smaller, has open grooves to hold the guns rather than holes, and cannot be locked.

Mr. Schlesinger testified that these articles were first sold through the home furnishing division of his company but they found that marketing would be better through the sporting goods division, which was logical as it carried the guns for the rack. That division also sold baseball gloves, all sorts of fishing tackle, rods, reels, nets, and optical goods which go with the sporting goods department. Gunracks are sold to sporting goods jobbers, chainstore dealers, and large retailers. They are resold in sporting goods stores, especially in the hunting divisions, or stores that carry rifles. The biggest volume of business is done by those who handle rifles and ammunition. They are sold in hunting divisions of stores, where wading boots, guns, ammunition, and sports equipment, such as tents, clothing, cots, even automobiles, are sold. These items come in a knocked-down condition and are put together by the purchaser, who would be able to hang or affix the wall models himself.

According to the witness, walnut finish is the number one finish in home furniture today so that finish was used on exhibit 1 in order to sell it to fit into existing rooms. He said that gunracks are primarily used in game rooms, den rooms, and family-type rooms, where the hunter or sportsman will display his guns, rods, and reels. In many homes which he had seen, a couple of racks were used to display gun collections. In his view, a family room can consist of an area having a very broad scope of recreation. Such rooms may have television sets which children watch, but if a gunrack used in the same room has a

locking device, it would be safe. He had seen a rack without a locking device used in the family room of his brother-in-law who has no young children.

The witness agreed with a definition of "furniture" from Webster's Dictionary which states that furniture is movable, or consists of the movable things in a room, which equip it for living, as chairs, sofas, tables, beds, etc. He said that gunracks fall within that definition because they are functional storage units and serve the same purpose as a chest of drawers except that they hold guns. Exhibits 2 and 3 can be made movable and generally are.

The question before the court is whether these articles are "furniture" within the common meaning of that term and as used in the tariff act. Plaintiffs claim that they belong to a class of articles commonly regarded as furniture in that they are for the use, comfort, and convenience of the homeowner, by keeping guns and ammunition safely contained in the same manner as a chest of drawers or a bookshelf. Defendant contends that they are used to store and display guns; that the type of hunting or sporting equipment with which they are sold, is not furniture; and that they are subsidiary appendages or adjuncts of comparatively minor importance.

Since the collector classified these articles as manufactures of wood, it is presumed that he found they were not furniture. Plaintiffs are required to overcome the presumption of correctness attaching to his classification. What evidence has been presented for that purpose? Principally, the samples themselves, and the testimony that they are used in homes for the storage and display of guns. There is no evidence that they are sold as furniture and they were admittedly not sold in furniture stores or departments but in sporting goods stores or departments.

Articles claimed to be furniture have been before this court on many occasions. The cases and types of articles involved were referred to in two recent decisions, *Shelford, Inc., et al.* v. *United States*, 54 Cust. Ct. 130, C.D. 2520, holding that seats with backrests and automobile backrests were furniture, and *National Silver Co.* v. *United States*, 54 Cust. Ct. 209, C.D. 2535, holding that folding wall hangers were not furniture. In the former case, we noted that the articles were of a sturdy character and were used for a purpose for which articles commonly known as furniture were used, namely, to support the back of a seated person. In the latter, we held that an article which was merely a framework with pegs, which had to be affixed with deep-driven nails in order to be of use, resembled hooks, pegs, and rods employed in cloakrooms, vestibules, closets, dressing rooms, and bathrooms to hold hats, clothing, and towels, and were not articles of furniture.

Since no commercial designation is claimed here, the issue to be decided is whether these gunracks fall within the common meaning

of the term "furniture." Common meaning is a matter of law to be determined by the courts on a case-by-case basis. *Marshall Field & Co.* v. *United States*, 45 CCPA 72, 80, C.A.D. 676. As an aid to their understanding, courts have relied primarily on lexicons and other written authorities and, where these have proved inconclusive, they have looked to testimony, but such testimony is advisory only and may be rejected. *Atlantic Aluminum & Metal Distributors, Inc.* v. *United States*, 47 CCPA 88, C.A.D. 735; *United States* v. *C. J. Tower & Sons of Buffalo, N.Y.*, 48 CCPA 87, C.A.D. 770. Sufficient testimony offered as an aid to the court's understanding of the common meaning of a term may cause a court to reach a different conclusion from that of a previous case. *United States* v. *A. J. Taylor of Santa Fe, New Mexico*, 48 CCPA 97, C.A.D. 772. Samples themselves are potent witnesses. *Marshall Field & Co.* v. *United States, supra.*

The following definitions are pertinent but not conclusive:

Webster's New International Dictionary, 1953 edition:

furniture * * *. 6. Articles of convenience or decoration used to furnish a house, apartment, place of business or accommodation, etc.; esp., movable articles such as chairs, tables, beds, cabinets, desks, stoves, etc.; * * *.

rack * * *. 5. A framework, stand, or grating, on or in which articles are placed, as for keeping or display; as, a clothes *rack;* a cake *rack;* a bottle *rack;* a galley *rack;* etc.

stand * * *. 7. A small table; also, something on or in which anything may be placed for support; as, an umbrella or music *stand.*

Funk & Wagnalls New Standard Dictionary, 1956 edition:

furniture, 1. That with which anything is furnished or supplied; equipment or outfit; specif., household articles, especially the main movables used in living-apartments, and made chiefly of wood, as chairs, tables, and desks; also, similar equipments of an office or public building: distinguished from *furnishings.*

rack * * *. 4. An open grating, framework, or other arrangement, as of bars or wires placed crosswise, and sometimes with pegs or hooks, in or on which articles may be deposited or suspended. Used in many more or less self-explaining compounds: as arm-rack, basket-r., bottle-r., card-r., galley-r., hat-r., manger-r., music-r., parcel-r., pen-r., rifle-r.

stand, 1. * * * (1) A small table on which things may be placed conveniently. (2) A rack or other piece of furniture on which hats may be hung, or canes, umbrellas, etc., supported; as a hat-*stand.*

New Century Dictionary:

stand * * * a framework on or in which articles are placed for support, exhibition, etc.; a piece of furniture of various forms, on or in which to put articles (as, a wash-*stand;* an umbrella-*stand*): a small light table, * * *.

It is, we believe, common knowledge that a sportsman, if his wife will let him, will likely display in the more frequently visited parts

of his home, trophies and memorabilia of his sport. Thus, we may see there moose heads, mounted sailfish, tennis rackets, skis, yacht models and photographs, cups, and ribbons. The sportsman is proud of his affiliation with his sport and wants people to know about it. Nor is this instinct confined to sportsmen alone. Persons possessing rare or learned books do not usually hide them in the attic. Persons who have traveled to Mexico afford evidence of the fact by their display of stone idols; those who have been to the Orient by screens or pottery. Gardeners display their plants. The décors of clubs portray with greater exclusiveness the interests of their members: sporting, artistic, or scholarly.

The articles at bar were designed, as the testimony shows, to cater to this instinct. They are apparently serviceable to hold guns, but they are not mere utilitarian gunracks. They are turned and finished for admission to the living room or recreation room of the American home. One of the exhibits is in natural wood finish while the other two are in walnut finish. However, according to the testimony, the merchandise at bar was all walnut finish. The exhibits present an attractive appearance, both in design and in execution. Two of the exhibits possess locking devices to make it safe for them to be used in areas frequented by children. Guns themselves are often finely crafted objects and antique ones are collected when they would no longer be lethal to anyone but the user. The most finicky housewife might be persuaded to admit such weapons to her living room, if displayed in the merchandise at bar.

The exhibits are readily movable; one stands on the floor and the others hang from hooks of the familiar type purchasable at any hardware store.

The case would seem to be governed by *Fabry Associates, Inc.* v. *United States*, 45 Cust. Ct. 88, C.D. 2203, in which we held that shelves, some supplied with drawers, as here, fitted to the underside, were furniture under paragraph 412. Those articles were attached to walls by metal brackets, which were furnished with the sets, along with plugs and screws. This is a more permanent type of attachment than is required for the merchandise at bar. The shelves held books, decorative items, radios, plants, etc. Such a display, in part honorific, in part aesthetic, in part utilitarian, is not readily distinguishable in principle from that here involved. There is nothing about sport to make shelves *or* racks dedicated to display of sporting objects different from any others for tariff purposes. Articles directly used in sports or games as, e.g., cue racks for pool, may be dealt with when the case arises. Likewise, racks, if any there be, from which guns are taken down for immediate firing, as, e.g., at a target range, possibly might be different. Uncontroverted evidence refutes that any such

use is the chief one of the merchandise here involved, as do the samples themselves. Our decision is confined to the case before us, and, of course, to the tariff schedules now superseded by the Tariff Schedules of the United States (TSUS).

The protest is sustained and it is held that the imported gunracks are properly dutiable at 10½ per centum ad valorem under paragraph 412 of the Tariff Act of 1930, as modified, as furniture, other than chairs. Judgment will be rendered accordingly.